This suit was instituted by Arthur Veltin and Arthur E. Veltin under the provisions of Act 38 of 1908, to have themselves recognized as the sole and rightful owners of the Southeast 1/4 of the Southwest 1/4 of Section 21, Township 6 South, Range 7 East. They allege that neither they nor the defendants, Mrs. Jeannette R. Haas and Mrs. Nathalie Haas Hirsch, are in possession of the property, which is wild, cut-over swamp land, and they pray for the cancellation from the conveyance records of St. Landry Parish of the *Page 652 
sheriff's deed in the proceeding entitled "Howard Cole v. Melville Land Company", No. 18,306 on the civil docket of the district court, and for cancellation of all subsequent transfers thereunder. In this petition, which was filed on May 21, 1937, they set up their own chain of title, which they trace to a tax deed of date May 28, 1910, and further allege that the defendants are claiming the property in question, predicating their claim on a chain of title emanating from the sheriff's deed of date January 21, 1910, in the foreclosure proceedings above mentioned, at which foreclosure sale, Howard Cole, one of defendants' authors in title, became the purchaser of the property involved in this suit.
On May 31, 1937, defendants filed a prayer for oyer, which was granted, and thereupon plaintiffs filed certified copies of the instruments setting up their chain of title, as well as a copy of the sheriff's deed to Howard Cole, one of defendants' authors in title, dated January 21, 1910.
On June 28, 1937, defendants filed an exception of no cause or right of action and a plea of estoppel. The minutes of the court shown in the record do not disclose any ruling by the trial court on this exception and the plea of estoppel. However, the trial judge in his reasons for judgment states that both were overruled.
On June 1, 1942, Arthur E. Veltin and Mrs. Anita Veltin Burgin were made parties to said suit as the sole and only heirs of Arthur Veltin, deceased.
On February 9, 1943, defendants, Mrs. Jeannette R. Haas and Mrs. Nathalie Haas *Page 653 
Hirsch, filed an answer to said suit and a call in warranty. The answer admits that the land in question is wild, cut-over swamp land, and sets forth that plaintiffs are not, and have never been, in actual physical possession thereof. The answer further sets up defendants' chain of title, and alleges that the tax sale upon which plaintiffs rely in this case as a muniment of title — that is, the tax deed from the Melville Land Company to Leopold Goudchaux and Samuel Haas, dated May 28, 1910 — is null, void, and of no effect for the following reasons, to-wit:
(1) That the sheriff's deed in the suit styled "Howard Cole v. Melville Land Company", in which Howard Cole became the purchaser of this property, states that the taxes for the years 1907, 1908, and 1909 had been paid and satisfied, in the following language as used in the deed: "I first collected from the said adjudicatee in cash the sum of Two Hundred and Fifty-two 76/100 Dollars ($252.76) total amount of the costs of said suit and of this sale and of the unpaid taxes on said property for the year 1909", and, further, "All taxes on said property for the year 1907, 1908 1909 have been paid".
(2) That the plaintiffs acquired nothing by virtue of their tax deed for the reason that the taxes for the year for which the property in question was sold to plaintiffs' authors in title had been fully paid and satisfied prior to the date of such adjudication to plaintiffs' authors in title on May 28, 1910.
(3) That Howard Cole, the record owner of the property at the date of the advertisement *Page 654 
and tax sale to Leopold Goudchaux and Samuel Haas, never received any notice of tax assessment, tax delinquency, etc., prior to the tax sale, nor were any such notices sent to, or served on, the said Howard Cole by the tax collector.
(4) That Leopold Goudchaux and Samuel Haas, plaintiffs' authors in title, acquired under said tax deed only whatever right, title, and interest the said Melville Land Company had in or to said land on May 28, 1910, and on that date said Melville Land Company had no right, title, and interest in said land, and therefore said Goudchaux and Haas did not acquire, nor could they have acquired, any title whatever to said property.
Defendants and respondents further plead the prescription of 10 years acquirendi causa, alleging that they and their authors in title have been in actual, corporeal possession of the property in question, publicly, notoriously, and uninterruptedly, in good faith and under a deed translative of title, since January 15, 1910.
They call in warranty Kyle Lumber Company, Ltd., and Riggs Cypress Company, Ltd., and pray for judgment in solido against the said warrantors for the original purchase price received by the warrantors in their sale of said property to Joseph U. Gillespie, one of defendants' authors in title, as well as for all taxes paid by the defendants and damages suffered, in the event that defendants are dispossessed of the land and their title declared invalid.
Kyle Lumber Company, Ltd., answered the call in warranty on March 16, 1943, reiterating *Page 655 
and adopting all the exceptions and pleas filed by the defendants and the defenses set up in their answer. The warrantor further alleges that the tax sale relied upon by plaintiffs was absolutely null and void and of no effect because the property was sold for taxes which had been previously paid, as shown by the return of the sheriff on the order of writ of seizure and sale in Suit No. 18,306, "Howard Cole v. Melville Land Company"; that respondent, Kyle Lumber Company, and Riggs Cypress Company acquired the property involved in this suit from Howard Cole 
Company, Inc., which in turn had acquired it from Howard Cole, who had acquired same by sheriff's deed in the foreclosure proceeding styled "Howard Cole v. Melville Land Company" at public sale on January 15, 1910, said deed being dated January 21, 1910, and recorded on the same day in the conveyance records of St. Landry Parish; that said Howard Cole, Howard Cole Company, and respondent, Kyle Lumber Company, Ltd., and its co-owner, Riggs Cypress Company, Ltd., went into possession of said property and remained in actual, open, and peaceable possession, as owners, by paying taxes thereon and by cutting and removing the timber therefrom in large, commercial quantities in the year 1912, and remained in possession for more than five years from and after the date of the sheriff's deed in question. The respondent lumber company further pleads the prescription of five years, as set forth in Act 6 of 1928, and also the prescription of 10 years acquirendi causa against all the claims of the plaintiffs herein. *Page 656 
Warrantor further admits that it and the Riggs Cypress Company, Ltd., are guarantors of the title of the defendants and are responsible for the original purchase price as well as for all taxes paid by the defendants. However, it denies that it is liable in solido for the full amount of the purchase price and taxes so paid, and admits liability for only one-half thereof.
On June 21, 1943, plaintiffs filed a plea of three-year prescription under the provisions of Article 233 of the Constitution of 1898, which provided that:
"No sale of property for taxes shall be set aside for any cause, except on proof of dual assessment, or of payment of taxes for which the property was sold prior to the date of sale, unless the proceeding to annul is instituted within six months from service of notice of sale, * * * or within three years from the adoption of this Constitution, as to sales already made, and within three years from the date of recordation of the tax deed, as to sales made hereafter, if no notice is given."
A plea of intervention was filed by the Gulf Refining Company, setting forth that defendants are the owners of the property in question, subject to a valid and existing oil, gas, and mineral lease to intervenor, and adopting as its own averments the allegations of defendants' answer.
The case was tried on its merits, and on March 9, 1944, after giving written reasons, the trial judge rendered judgment sustaining the plea of prescription of three years filed by plaintiffs and decreeing them *Page 657 
to be the owners in fee simple of the property in question and ordering "that the cancellation and erasures to the pretended title to said land be duly made by the Clerk of Court to the property described herein".
On March 17, 1944, defendants applied for, and were granted, both suspensive and devolutive appeals to this court, and on March 29 intervenor, Gulf Refining Company, was granted a devolutive appeal. Kyle Lumber Company, Ltd., warrantor, did not appeal from the judgment of the lower court.
Both plaintiffs and defendants trace their titles to the land involved to the Melville Land Company, which acquired the property by deed dated June 21, 1906.
Defendants' author in title, Howard Cole, acquired the property on January 21, 1910, by virtue of a sheriff's deed in a foreclosure sale in the suit styled "Howard Cole v. Melville Land Company". On June 10, 1910, Cole sold the property to Howard Cole Company, and on October 17, 1910, that company conveyed the land to the Kyle Lumber Company, Ltd., and Riggs Cypress Company, Ltd. These parties subsequently sold the same to Joseph U. Gillespie as per deed dated January 4, 1919. Gillespie in turn conveyed the property to J. G. Lawler on January 8, 1919, and thereafter, on April 9, 1920, Lawler sold the land to Dr. John A. Haas, who in turn sold the same on January 6, 1923, to the defendants herein.
Plaintiffs' authors in title, Leopold Goudchaux and Samuel Haas, acquired the property at tax sale as per tax deed dated May *Page 658 
28, 1910, recorded July 8, 1910, at which tax sale the property was sold for taxes assessed to the Melville Land Company for the year 1909. Goudchaux and Haas on March 19, 1912, conveyed the property to the Krotz Springs Hotel Company, which in turn sold same to Walter F. Brown on September 3, 1918, Brown thereafter, as per deed dated January 11, 1927, selling to Arthur Veltin and Arthur E. Veltin, the original plaintiffs herein.
The testimony adduced during the trial of this case on its merits is principally in support of defendants' plea of 10-year prescription acquirendi causa, and it is therefore proper for this court to determine whether or not the plea in question has merit and is well founded under the facts of the case under consideration.
The land involved in this suit is low, swamp land, subject to overflow annually, the water varying thereon from four to eight feet in depth. The tract is not suitable for cultivation or habitation, and no one resides thereon or in the vicinity thereof. It is not near any settlements or public roads. In 1910, when the Kyle Lumber Company acquired this land, the principal commercial purpose for which it could be used was the cutting and removing of timber therefrom. These facts are conclusively shown by the testimony of certain witnesses. Charlie Hook, plaintiffs' witness, testified as follows:
"Q. Do you know the type or character of the lands in that section? A. It is all low land, swamp land.
"Q. Is any of it susceptible of being lived upon or having persons erect homes and *Page 659 
reside on it? A. Only up on the bayou, you could camp up there on the bayou certain times, it is a ridge, but there is no ridge there [on the property in question].
"Q. Do you know of any homes in Section 21, where people live? A. No, sir.
"Q. You stated, I believe, that the nature of this land was principally swamp land? A. Yes, sir.
"Q. That is correct? A. Yes, sir." (Transcript, Volume II, pages 8, 9)
Newton Williams, called as a witness by plaintiffs, testified as follows:
"Q. Do you know the particular piece of property which is the SE1/4 of SW1/4 Sec. 21, T-6-S., R-7-E, involved in this suit? A. Yes.
"Q. Are you familiar with the kind of land that that is? A. Yes, sir.
"Q. Please tell the Court the nature of that land, whether it is low swampy or high or cultivable? A. It is not cultivable, it is considered overflow land.
"Q. The whole of the land in that quarter section is considered swamp land? A. Yes.
"Q. Are there any houses or other habitable dwellings on the Section? A. No, sir.
"Q. Since the time you know the property, which I believe you stated was about 1918, has there been any camp or other dwelling occupied on the land? A. No, sir. * * *
"Q. Does that land overflow practically every year? A. Yes, sir, generally every year. *Page 660 
"Q. It is not subject to cultivation or habitation at all? A. No, sir.
"Q. And the only commercial purpose for which it could be used, was the timber? A. No, sir.
"Q. After the timber is off, what good is the land, could it be cultivated? A. No, sir.
"Q. Couldn't be used as a habitat? A. No, sir, it wouldn't be any good for people to camp on. It is too far from any stream. (Pages 22, 23) * * *
"Q. Would you say the particular 40 acres is very low? A. Yes.
"Q. There is no ridge on it that you know of? A. No high ridge, the water varies from 8 to 4 feet.
"Q. The water standing on it now varies from 8 to 4 feet of water? A. Yes." (Page 25)
The testimony of Lloyd Waterhouse, defendants' witness, reads in part as follows:
"Q. At the time this timber was cut, what was the character of the land, was it open or wood or swamp land or what? A. It was wood swamp land.
"Q. Was anybody living on that quarter section at the time you went on it? A. No.
"Q. Was there any fences around it? A. No.
"Q. How far was that land from the main road going to Krotz Springs? A. The main road that goes now to Krotz Springs?
"Q. Yes. A. It is about three miles. *Page 661 
"Q. What was the nearest public road at the time through this particular piece of swamp land? A. I don't know, the only public road we had at that time was the one that came above through Krotz Springs from Melville, followed the levee down. As well as I remember that was about the nearest one.
"Q. That was about how far? A. From Krotz Springs there, it is in the neighborhood of three or four miles." (Page 52)
The testimony adduced at the trial of the case on its merits shows conclusively that, immediately after Kyle Lumber Company acquired the property as per deed dated October 17, 1910, recorded on November 18 of the same year, it employed one Jim Kemper, a civil engineer, to make a survey of the property, and that, between the dates of December 6 and 14 of the year 1910, Kemper, accompanied by Lloyd Waterhouse and John Surrette, employees of Kyle Lumber Company, proceeded to survey the property acquired by the lumber company, which survey included the South 1/2 of Section 21, Township 6 South, Range 7 East, of which half-section the property here in dispute forms a part.
Mr. Kemper, who was called as a witness, testified that, in making the survey:
"I marked the corners I made with an X and 3 hacks. The corner that faces the property I was surveying for the Kyle Lumber Company, I put a K on it, the corner that didn't face it, I didn't put a K on it." (Page 38)
It is true that, in surveying the South 1/2 of Section 21, the surveyor ran only *Page 662 
the south boundary line of the Southeast 1/4 of the Southwest 1/4, and did not run the east, west, and north boundary lines of the 40-acre tract involved in this suit. However, the record shows beyond any question that he was employed by Kyle Lumber Company to survey its property and in doing so surveyed the South 1/2 of Section 21, which necessarily included the the Southeast 1/4 of the Southwest 1/4, the property in question.
As evidence of Mr. Kemper's survey made in 1910 at the request of Kyle Lumber Company, Ltd., we find in the record a map made by him on which the property surveyed is tinted red.
The fact that the land was surveyed and marked as testified by Mr. Kemper is further shown by the testimony of John F. Bennett, a civil engineer, who surveyed the property for the Gulf Refining Company in the summer of 1942. Mr. Bennett stated that he found a surveyor's mark at the southeast corner of Section 21, said mark consisting of an "X", three hacks, and the letter "K".
One Lloyd Waterhouse, a contractor who was engaged in the business of cutting and removing timber for the Kyle Lumber Company, Ltd., and who had selected the land subsequently purchased by said company, soon after the purchase of the property on October 17, 1910, and shortly after the survey made in December of the same year, began logging operations with a crew of men which varied from eight to 40 employees, and proceeded to deaden, cut, and remove from the tract involved in this suit all the merchantable cypress timber thereon. *Page 663 
He testified that in these operations he and his men established a camp near the 40-acre tract in question and proceeded to construct a float road on the Southeast 1/4 of the Southwest 1/4 of Section 21, the land involved in this suit. They were engaged in these loggings operations, he said, for a period of two years — namely, the years 1911 and 1912. It will be noted that Lloyd Waterhouse is one of the employees of Kyle Lumber Company who accompanied Mr. Kemper while he was making his survey in 1910.
The testimony shows that the cypress timber on the land was not cut and removed at intervals, and that it was not cut and removed from a portion only of the 40 acres. On the contrary, the testimony shows beyond question that during the years 1911 and 1912 all the merchantable cypress timber was cut and removed from every portion of the tract. These operations by the Kyle Lumber Company, through its agents and employees, were performed in good faith and under a deed translative of title and valid on its face.
It will be noted that the timber in question was deadened and prepared for cutting in the year 1911, and that in 1912, due to extremely high water, it was necessary to cut the timber anywhere from five to seven feet above the undercut and deadening around the trees, and due to this condition the stumps which remained on the land were from eight to 10 feet in height. Plaintiffs' own witness, Charlie Hook, who has lived in the vicinity of the property here involved for a great many years, and who was one of the men engaged with *Page 664 
Lloyd Waterhouse in these logging operations, testified that, to his knowledge, no timber was ever cut in the area of these operations nine or 10 feet above the ground other than that cut by Lloyd Waterhouse's crew in 1911 and 1912 from the property involved in this suit. His testimony on this point is as follows:
"Q. You remember well that you cut the timber on that 40 acres? A. Yes, sir, and the stumps prove it.
"Q. What about the stumps proving it? A. When the water was low, we went in and deadened the timber, when the water was low.
"Q. What year was that? A. 1910, beginning of winter when the sap was down, we under cut it.
"Q. How high off the ground did you deaden? A. On the ground, except when we got a big spur tree we would climb up there. It wasn't often we got one like that. Then when we went in and cut a few trees in the spring of 1911 but we didn't get but a little water that year, and we needed water to float. In 1912 we just got plenty water.
"Q. What happened? A. Then we cut the timber above the rung and under cut.
"Q. How high from the ground did you cut the timber? A. Six or seven feet above the under cut.
"Q. How far above the ground would that be? A. I judge the rung is about three feet, and then we cut 6 or 7 above that. *Page 665 
"Q. In other words, where you cut was about 9 or 10 above the ground? A. Yes, Mr. Waterhouse couldn't camp in the camp because the water took it. We had to build a camp crib and stay on that.
"Q. Was any other timber ever cut in that area to your knowledge some 9 or 10 feet above the ground, other than that cut by Mr. Waterhouse's crew in 1912? A. No, sir.
"Q. When the party went there Saturday, did you see any evidence of this occasion, were any of the stumps still there? A. All the stumps were still there up to the line.
"Q. That is on this 40 acres? A. Yes.
"Q. They are still there and there are still a large number of stumps? A. Yes." (Pages 14-16)
In the logging operations of Kyle Lumber Company, its employees, under the supervision and control of Lloyd Waterhouse, who was foreman, cut a float, commonly called "Lloyd's road", on the land in controversy, the Southeast 1/4 of the Southwest 1/4 of Section 21. This road was used for the purpose of floating the timber from the land in question by means of "gas boats". This road is "known by all the old people" as the "Lloyd Waterhouse road".
In the latter part of 1919 and the early part of 1920, one Arthur Waterhouse cut all ash 16 inches in diameter or larger from the Southeast 1/4 of the Southwest 1/4, the land in question, having acquired this timber from J. G. Lawler, one of defendants' *Page 666 
authors in title. Thereafter, in the spring of 1921, Arthur Waterhouse, through his employees, returned to the land and cut and removed all the remaining merchantable ash timber, cutting in both operations some 20,000 or 25,000 board feet from the particular tract in controversy.
On June 19, 1943, the Saturday before the trial of the case, Lloyd Waterhouse, Newton Williams, John Surrette, John F. Bennett, and others returned to the property involved in this suit, and by their testimony shown in the record proved conclusively that portions of the old Lloyd Waterhouse road or float were still in existence, and that the stumps which had been cut some eight or 10 feet above the ground were still standing on the property. On these points their testimony is as follows:
Charlie Hook:
"Q. When you came back to the camp in Section 22 which is West of the 40 acres in controversy, did you find any land marks or old roads or anything? A. Yes.
"Q. What road did you find? A. The Lloyd Waterhouse road, it is known by all the old people.
"Q. They call it Lloyd's road for Lloyd Waterhouse, who is present in court and who was your boss on the cutting job? A. Yes, sir, we cut the road.
"Q. Did this road go on this tract? A. About the center, I think.
"Q. What kind of road was that? A. A log road, we hauled logs through with gas boats, no mules or trucks could go in there at that time. *Page 667 
"Q. It was a road anybody could follow? A. Yes, anybody that knew about it. * * *." (Page 12)
Newton Williams:
"Q. On the way back, did you come to Lloyd's road? A. Yes, sir, had to cross it to go to the camp.
"Q. You know the road well? A. Yes, towed timber on it before it sanded up.
"Q. That road goes through the SE1/4 of the SW1/4, the land in dispute? A. Yes, sir.
"Q. You heard what Mr. Hook said about the stumps being so high above the ground? A. Yes.
"Q. Did you see the stumps? A. Yes.
"Q. There were a substantial number of cypress stumps there? A. Yes." (Page 24)
Lloyd Waterhouse:
"Q. Did you cut a float road to the land I have described? A. Yes. * * *
"Q. Did you cut it [the cypress timber] from boats? A. Yes, sir, and there are a good many stumps probably yet.
"Q. How high from the surface of the surrounding land was it you cut these trees? A. From the surface of the land it would make it anywhere from 8 to 10 feet high.
"Q. Are those stumps there yet? A. They are.
"Q. When did you see them lately? A. Last Saturday." (Pages 46, 47) *Page 668 
John Surrette:
"Q. Was there anything unusual about the stumps on that particular tract that you viewed Saturday? A. Yes, sir, the timber had been undercut and deadened and then had been cut above the undercut, apparently from the high stage of water.
"Q. Is that unusual? A. No, sir, it can't be helped at times.
"Q. Is there any land in that immediate area where stumps were cut, that high, other than the 40 you saw? A. I don't know of any. (Page 84) * * *
"Q. This Lloyd road was put down in 1911? A. Yes.
"Q. What is the condition of the road now? A. It is not open so well, but other people have worked and travelled it some, but it can be followed.
"Q. It doesn't run up to the 40 acres? A. It is near, maybe some of it is on it.
"Q. Is it usable? A. Yes, sir.
"Q. Is it in use now? A. We used it.
"Q. You used it in 1911? A. We used it Saturday, we travelled part of it.
"Q. Wasn't it under water? A. Yes, we travelled in a boat. We were floating but we were on the road. (Page 86) * * *
"Q. On this road you speak of, Lloyd's road, isn't it a fact that brush and trees have grown over the road? A. Not much, from time to time different people have used it. It can be floated pretty well." (Page 88) *Page 669 
Taylor Talley:
"Q. From the camp, where did you go last Saturday? A. We turned back and came to the spot we started, and on the way back we located Lloyd's road. It showed where the old road was cut.
"Q. For whom was that road named? A. Lloyd Waterhouse.
"Q. Did you recognize that road? A. You could tell it was a road, I guess it has stopped up in places, but you could tell there had been an old road there.
"Q. Did the road go on the 40 acre tract in question? A. If that is where it was the road went there, went through. (Page 100) * * *
"Q. Was there any evidence of cutting when you went back there last Saturday? A. When we went there Saturday, by the look of the stumps, it was cut 9 or 10 feet high, that is the only evidence I have it was the same land.
"Q. Did you see any other cutting that high above the water in the immediate neighborhood other than the 40 acres? A. No.
"Q. What kind of timber did you cut? A. Cypress only. (Page 101) * * *
"Q. This Lloyd road that you speak of is now grown up in brush and little trees? A. Yes, sir, but you can see it was a road, you can see in spots it was a road.
"Q. But to be used for logs again, it would have to be cleared out? A. I suppose so." (Page 102) *Page 670 
John F. Bennett:
"Q. Did you see any opening that indicated a float road? A. Yes, sir, there were two. One had been used quite recently and the other one not so much. I was told it was Lloyd's road, the one that hadn't been used recently.
"Q. That was pointed out as Lloyd's road, the one that hadn't been used recently? A. Yes.
"Q. Of course you recognized the surveyor's marks on the trees? A. Yes. (Page 108) * * *
"Q. Would you have had any trouble going along that road, even if it hadn't been pointed out to you, if you wanted to go in that direction? A. If I wanted to use the old float road.
"Q. The point is, was it last Saturday, a well defined passage through the woods? A. It was an open passage way, not in a sense to be travelled by buggy and horse or automobile. It was a float road." (Page 110)
W. B. Robert:
"A. We went in boats in a northerly direction from this point and then I lost track of the direction we were going, I wasn't interested in the direction, we went down a float road, it was much clearer than the surrounding woods and you could handle small boats down it without difficulty.
"Q. What was the name of the road? A. They said Lloyd's road. *Page 671 
"Q. To what point did you go? A. I went close to Lloyd's camp or Waterhouse's camp, I don't know which it was.
"Q. About how wide is that float road now? A. 15 or 20 feet I should say. * * *
"Q. Did you observe any unusual appearance of the cypress stumps on the tract? A. The stumps had been cut about 10 feet above the water line and had been belted about the water line and evidently the water got above the first deadened part and it was necessary to cut the trees off above the high water.
"Q. Did you observe that? A. I observed they were cut about 10' above the water.
"Q. On this particular tract? A. Yes." (Pages 116, 117)
It is also to be noted that the defendants granted an oil and gas lease on the property in question to the Roxana Petroleum Corporation on January 18, 1926, and again leased the property for oil, gas, and other minerals to J. B. Ferguson, Jr., on November 18, 1935, which lease was later assigned to Gulf Refining Company, intervenor herein.
It is further to be noted that, according to a tax statement filed in the record by agreement of counsel, defendants and their authors in title were assessed with, and paid, the taxes on the property in question for the years 1910 through 1919 and for the year 1921. (The 1920 assessments and payment of taxes are not shown in the record because of the condition of the tax rolls.) They also paid the taxes assessed *Page 672 
for the years 1936 through 1942. In other words, defendants' authors in title paid the taxes on the property in question, after it was acquired at sheriff's sale on January 21, 1910, for a period of 11 years. And it is also true that during this time, particularly during the years 1914, 1915, and 1916, plaintiffs' authors in title also were assessed with the property but never paid the taxes due thereon. However, they, the plaintiffs, did pay the taxes assessed for the years 1921 through 1942.
The testimony in this case clearly shows that Kyle Lumber Company, Ltd., and Riggs Cypress Company, Ltd., after acquiring the property as per deed dated October 17, 1910, recorded November 18, 1910 — a deed valid on its face and translative of property — actually took corporeal possession of the property in question by having a survey made of the South 1/2 of Section 21, which necessarily included the Southeast 1/4 of the Southwest 1/4 of that section; that said survey was made by one Jim Kemper, a civil engineer, accompanied by Lloyd Waterhouse and John Surrette, employees of the lumber company, the said Waterhouse having, prior to said survey, actually selected the land in question to be purchased by Kyle Lumber Company for the purpose of having the cypress timber cut and removed therefrom, and that said survey was made so that the lumber company, through its employees, could cut the timber on the property actually purchased by it; that this survey was made between December 6 and 14 of 1910; that during the years 1911 and 1912all the merchantable cypress timber was cut and removed *Page 673 
from the tract in question, and that in these logging operations a camp was established near, but not on, the property, and that from eight to 40 employees of the lumber company were actually engaged in cutting and removing said timber; that during said years the lumber company actually cut and removed all the merchantable cypress timber from every portion of the 40 acres in question; that a float road was constructed on said property by the employees of the lumber company for the purpose of transporting logs cut from this and other land; that evidence of said road is still in existence, and that it was used as late as June 19, 1943; that said road is known to all the inhabitants as "Lloyd's road"; that, in removing the timber on the land in question, due to high water it was necessary to cut the trees from eight to 10 feet above the surface of the ground, a rather unusual procedure, and that said stumps as late as the year 1943 were still visible and easily recognized; that, in the latter part of 1919 and the early part of 1920, all the ash 16 inches in diameter and larger was cut and removed from the 40 in question by one Arthur Waterhouse, who acquired the timber from defendants' author in title, and that thereafter, in the spring of 1921, all the remaining ash was cut and removed by him.
The record shows that the defendants' authors in title were assessed with, and actually paid, all taxes assessed against said property for the years 1910 through 1919 and also for the year 1921. In the years 1914, 1915, and 1916, the property was assessed to both plaintiffs' and defendants' *Page 674 
authors in title, but defendants' authors in title actually paid the taxes due thereon. The record further shows that plaintiffs paid all taxes assessed for the years 1921 through 1942, and that defendants were assessed with, and paid, the taxes for the years 1936 through 1942.
As further evidence of defendants' claim of ownership, we find in the record an oil and gas lease covering this property, granted by them on January 18, 1926, to the Roxana Petroleum Corporation, and another such lease granted by defendants to J. B. Ferguson, Jr., on November 18, 1935.
It is true, however, that on January 9, 1936, subsequent to the dates of the above mentioned oil and gas leases, plaintiffs, Arthur Veltin and Arthur E. Veltin, executed an oil and gas lease on this land to one H. J. Wier. However, nowhere in the record do we find any evidence that plaintiffs themselves or their authors in title ever took corporeal possession of the property in question, and, in truth and in fact, they allege in their petition that the land in question is wild, cut-over swamp land, and that neither they nor the defendants are in actual physical possession of said property.
This brings us to the question of whether or not the possession by defendants and their authors in title of the property in question, as shown by the record, is sufficient basis for their plea of 10 years' prescription acquirendi causa, bearing in mind the character of the land as set out hereinabove and the purpose for which the same could be used. In discussing land of this character, this court has used the *Page 675 
following expressions, dating back as far as 1885:
"If actual corporeal possession of wild timbered land in unreclaimed forest be necessary in order to enable one to acquire it by prescription, then it could never be so acquired unless we should invent some symbolic ceremony such as livery of seizin at common law." Giddens v. Mobley, 37 La.Ann. 417.
"The corporeal possession necessary to support the prescription is governed by the use for which the land is destined. If it is for pasturage, the grazing of cattle upon it is an act of corporeal possession. From its nature, it may prohibit an actual residence or cultivation. Timbered land may be enclosed, trees cut, roads run through it, and many other similar acts to show the intention to subject it to one's dominion." Chamberlain v. Abadie, 48 La.Ann. 587, 19 So. 574, 575.
"That which is essential for actual possession changes with the nature of the property. It is different when it relates to one kind, from what it is when it relates to another.
"Fields are taken possession of by cultivating them and gathering their fruits. The cultivation of flowers on a solitary hill which stands up or rises out of a plain may go far toward sustaining claim to the adjacent plain. Possession of low lands not fit for cultivation may be secured by establishing their boundaries, and seeking to protect the birds that meet and abide thereon, or the fish in their water, or by cutting thereon firewood, or any other active steps *Page 676 
to the end of securing possession." Boagni v. Pacific Imp. Co.,111 La. 1063, 36 So. 129, 131.
"There may be physical possession of swamp lands.
"The value of the land is in the trees. To cut them down and take them away requires considerable preparation and the use of different appliances. It may be that the mere cutting down of a few trees is not possession. It is different where operations are carried on with a view of pulling a number of trees, and when at every returning season work is done. The sound of the woodman's axe is heard; the stir of the hands; the swamp boat going up and down the small streams; its resounding whistle heard — all go towards denoting possession." South Louisiana Land Co. v. Riggs Cypress Co., 119 La. 193, 43 So. 1003, 1005.
In Long v. Chailan, 196 La. 380, 199 So. 222, 226, the court said:
"The cutting and removing of timber from open swamp land is a sufficient character of possession to support the prescription of ten years if the operations are carried on frequently and for a considerable length of time and are accompanied by public signs showing an intention to possess the land, such as constructing and maintaining roads and other works, and paying the taxes on the land. Baker v. Towles' Administratrix,11 La. 432; Chamberlain v. Abadie, 48 La.Ann. 587, 19 So. 574; Industrial Lumber Co. v. Farque, 162 La. 793, 111 So. 166; Kees v. Louisiana Central Lumber Co., 183 La. 111, 162 So. 817. All *Page 677 
of these cases are cited with approval in Martel v. Hunt,195 La. 701, 197 So. 402."
In Dupuy v. Joly, 197 La. 19, 200 So. 806, 809, it was said:
"Anatole Joly, the purchaser, took actual possession of the land in the year 1916, at which time it was covered by a heavy growth of timber. The timber was deadened and the necessary tracks and float roads were cut for the removal of the timber, which took place in the following years, during the periods of highwater in the swamp. These timber and logging operations extended over the whole tract and resulted in the removal of all the merchantable timber on the tract. As late as the year 1927, the land was worked for the purpose of scrapping the timber, but at that time very little timber remained on the property. In the years 1919 and 1920, a number of men were employed in gathering moss which was abundant among the trees. The testimony shows that the land was swampy in character, subject annually to overflow and that it was unfit for any other use than that to which it was put by Joly, or by others holding under him. This character of possession has been held to be sufficient to form the basis for the prescription of ten years' acquirendi causa. Kees v. Louisiana Central Lumber Co.,183 La. 111, 162 So. 817; Baldwin v. Arkansas-Louisiana Pipe Line Co.,185 La. 1051, 171 So. 442."
We are convinced that the Kyle Lumber Company, soon after its purchase on October 17, 1910, actually took possession of the land in question as owner, in good faith and under a deed translative of *Page 678 
property, and that its possession, coupled with that of its vendees, continued to be open and uninterrupted for more than 10 years after 1910, and for these reasons we are of the opinion that the plea of 10 years' prescription acquirendi causa should have been sustained by the lower court.
Since we have concluded that the plea of prescription of 10 years acquirendi causa, filed by the defendants, is well founded, we find it unnecessary to discuss or pass upon the other issues raised by the parties in these proceedings. Even if it be conceded that plaintiffs acquired a tax title to this property by the prescription of three years, such title cannot prevail against defendants' title established by the 10-year prescription acquirendi causa.
For the reasons above assigned, it is ordered that the judgment of the lower court be, and the same is hereby, reversed and set aside, and plaintiffs' suit dismissed. It is further ordered that defendants' plea of prescription of 10 years acquirendi causa be, and the same is hereby, sustained; and accordingly it is ordered that defendants, Mrs. Jeannette R. Haas and Mrs. Nathalie Haas Hirsch, be recognized as the sole and rightful owners of the property involved in this suit as against the claims of plaintiffs herein; plaintiffs to pay all costs.
ROGERS, J., concurs in the result.
O'NIELL, C. J., dissents, being of the opinion that the defendants, or their ancestors in title, did not have the possession necessary for them to acquire title by the prescription of ten years, under articles *Page 679 
3478 and 3487 of the Civil Code, or to prevent the perfecting of the plaintiffs' tax title by prescription.